The panel has before it three cases for oral argument. Before we begin, we'd like to recognize the contribution being made today by Judge Matthew Canelli, who is the judge of the District Court from the Northern District of Illinois, who is doing double duty here to sit with our court and be a part of this panel. We thank him for that. We'll hear argument first in Appeal No. 1326 from 2007, Committee for Fair Beam Imports v. United States. Mr. Shane, good morning. Welcome. The podium is yours. May it please the Court, I will be addressing three issues this morning. First, the Commission's erroneous finding that China's emergence as a net exporter of steel beams did not significantly affect the behavior of subject producers. Did or would not? I thought the whole question here was a prospective judgment, a prediction about what would happen in the future. That's correct. One of the issues that the Commission examined in trying to respond to that issue was what happened as China became a net exporter of beams. In order to predict the future as to what would happen upon revocation, one of the questions the Commission examined was what happened in the recent past with regard to... And your view is their retrospective fact-finding lacked substantial evidentiary support? Yes, correct, because our contention is that in looking at that issue, among others, the Commission overlooked critical evidence. What do you mean overlooked? Did not comment on evidence. So what? I mean, where there's a massive record, no tribunal comments on every single piece of evidence is not practical, not required, probably not even really possible. I understand. So the mere fact that every piece of evidence isn't discussed I don't think gets you to reversible error. It's not our contention that the Commission needs to comment on every piece of evidence on the record, Your Honor. It's our contention, consistent with case law, that where you have critical evidence on the record that goes to the heart of the issues that the Commission is examining, that that information, that evidence has to be addressed by the Commission. And that's consistent with the Altex case, that's consistent with Atlantic Sugar, Usinor, and other cases out there that say the Commission… Well, what specifically was the piece or pieces of evidence that you say are so central to the dispute that the failure to address them in the Commission's ruling would be reversible error? With respect to the first issue that I'm going to address, which was China's emergence as a net export… No, but I'm asking a question about evidence, not the concept of China's emergence. What piece of evidence was so central to the case that the Commission's failure to discuss it by itself constitutes reversible error? What specific evidence? Right, I understand your question. Let me try to respond to it again. The evidence, number one, is that Japan, as China became a net exporter of beans, the Japanese exports to China, as well as the Korean exports to China, dropped off dramatically at that point. Why isn't it that there's a statement in the Commission's opinion, at page 22 of their opinion, which is page 226 of the appendix, where they observed that Japanese producers reported exports to China peaked, in particular a year well before the Chinese transition. Why isn't that close enough? I mean, they address that the exports peaked, which means that they've gone down. Right. The issue is, we think, in terms of the timing, the critical timing is when did China become a net exporter, or thereabouts, because that is when you're going to see the effect with respect to Japanese and Korean shipments at that point. Not two or three years earlier. If you look at that critical time frame, 2004 and 2005, which is the evidence that the Commission did not comment on, you see a dramatic fall-off in exports of both Japanese and Korean exports to China. You see a dramatic fall-off with respect to Japanese exports to Asian countries in 8 out of 10. Well, I take it that the Commission, among other things, said that since the fall-off preceded China becoming a net exporter, that the purported cause and effect just wasn't there. Now, if that's sound, the fact that they don't then discuss the data in the later era doesn't seem to be a flaw or a serious omission at all. In our view, the fact that exports may have fallen off somewhat in an earlier period is not indicative of what happened when China became a net exporter. It may be not predictive, but as to cause and effect, it seems like it's quite important when the fall-off started, if you're ascribing the fall-off to the change in status of China to a net export. The way I read this passage that we're talking about here is that they're saying that it fell off before it didn't have any effect, and then they essentially take that and say then there's no reason to expect that anything different is going to happen in the future. They may have skipped over a specific mention of the specific little bit of evidence that you're talking about, but it seems to me that they dealt with the idea. How did they not deal with the idea when they've connected up what happened with the past to what they think is going to happen in the future? As I noted, I think the critical issue is what happened when China became a net exporter of beans. The fact that there was somewhat of a fall-off a number of years earlier doesn't address how China's emergence as a net exporter of beans is going to affect the Japanese and Korean producers. It seems to us that you've got to address that critical time period, especially when you have that significant drop-off with respect to Japanese shipments to China, Korean shipments to China, shipments of the Japanese to other Asian markets. You've, in your brief and now in your oral argument, have referred to the point at which China became a net exporter, but I'm a little bit at a loss to see why that moment is of particular significance. Isn't the real significance the change, the degree and rate of change from importing to exporting in China? If it went from being a net importer of 10,000 tons in one year to a net exporter of 10,000 tons in the next year, nobody would be arguing that that's a significant effect, right? Even though it became a net exporter at that point. What do you have by way of evidence that there is a massive change in the Chinese situation in going from imports to exports that necessarily would have the effect of putting the Japanese and the Korean in a position to be looking for new markets outside of Asia? Sure, Your Honor. I think if you look at what happened to the Chinese, they shifted in a dramatic way from importing a lot to then becoming a net exporter. If you look at what happened in terms of their actions, their exports increased to other Asian markets, to Korea, for example, and other markets as well. We pointed to that evidence in our briefs. You can see what happened after that affected where the Koreans were shipping, for example. They were knocked out of markets in Asia. The Commission itself recognized that, in fact, the Korean exports were increasing. But not to the United States during this period?  What was the dumping margin, by the way? With the Koreans, I think it varied based on the producer. Roughly. I think anywhere from 5 to 15 percent. I don't recall on that, but I think it's in the records. Nevertheless, the Commission looked at what the Korean producers were doing with regard to exports and concluded that because they continued to export, when China became itself a net exporter of beans, that that bolstered their opinion that there was no change with regard to Korean producer behavior. In other words, there was a big change in Korean producer behavior, but not one that increased imports here. They apparently increased imports, for example, to Europe. Well, we think that's significant because what our argument was, was that as the Chinese were increasing their exports to Asia, the Koreans were going to be forced out of other markets in Asia and have to find alternative markets. That depends on demand. If the demand in Asia is keeping up with the Chinese increase in production, then there's no effect. Assuming the Chinese are producing. One of the points made by the Commission was that there was this effective balance of demand and production. I think our response to that was when they looked at that issue, they didn't look at the most critical evidence, which would answer the question of supply and demand, which is what is going on in Korea and Japan. I thought they did look at that. They discussed that at some length. They never connected the production and consumption in their analysis. In other words, the fact that in Japan, production was going to vastly outstrip consumption from 2005 to 2007, that Korean production was going to vastly outstrip consumption. Domestic consumption you're talking about? Yes. Sorry. Domestic consumption, Your Honor. In terms of answering the question of is there an incentive for these subject producers to ship product to the U.S. if the orders are remote, it seemed to us that the critical question is what's going on in their home markets in order to determine whether or not they have motivation to ship to the U.S. upon revocation. You had two other arguments you wanted to get to because you're getting very short on time. The second one is the one that I've just addressed, which is the fact that you have this vast outstripping of production versus consumption in Japan and Korea, which was not addressed by the Commission. Was price disparity going to be your third point? Yes. That's one of interest to me if you could address that. Okay. I'd be happy to do that. In terms of the price disparity argument, again, our concern is that the Commission overlooked key data on the record with regard to the price disparity. The price disparity that is critical here is the price disparity that developed at the end of the review period. It was a significant one, both between the Japanese and Korean markets versus the U.S. market, as well as the U.S. versus other markets. What is your point? Did they give too much weight to the earlier periods instead of giving overwhelming weight to the short later period that you're highlighting? No. Our point is first that that gap that happened at the end of the review period was significant. It was much larger than any gap during the review period. The question, and therefore was of particular significance, in determining whether or not there was an incentive or motivation for the Korean and Japanese producers to export to the U.S. if the orders were revoked. After all, the Commission found that the Japanese and Korean producers had the unused capacity to ship a lot of product to the U.S. They also had the ability to shift among various export markets. And so the question then is, did they have a choice? Well, of course they could have done it. It's not disputed that they could have done it. The dispute is whether there was reason to believe they would do it in some fashion that was so material as to cause significant harm to the domestic industry here in the United States. Correct, Your Honor. And our contention is, with regard to the price disparity issue, that that large gap that developed only at the end of the period was critical in terms of looking at whether or not an incentive existed for the Korean and Japanese producers to ship. What was the error? The error was that they did not recognize that large price gap. They overlooked it. What do you mean overlooked? I still am having a lot of trouble understanding how you get – They excluded the evidence. They refused to weigh it in their complex analysis. I don't see any basis for that. Our contention is not that they excluded it from the record, Your Honor. Our contention is that when you have that type of evidence on the record that goes to the heart of the issue, they are required to comment on it, as set forth in all texts, as set forth in Atlantic Sugar, that they can't simply ignore that. They can't ignore the elephant in the room. Correct. This was an elephant. This was so big that it overcomes any argument about preferences for domestic supply being the driving force. Once you have a price disparity that's so great, your point is that just trumps everything else and requires, compels the commission to address. That's correct, Your Honor. In particular here where you have the Koreans admitting on the record that they're profit-oriented, that they're profit-driven. What do you want, a remand so the opinion can be expanded? Well, I think we need a remand so that this evidence, which was not addressed by the commission, can be addressed and examined. Well, how about if we address the evidence and see if it shows that the underlying merits decision had to be wrong? That's your prerogative, Your Honor. What are you asking for? Well, I mean, I think we would prefer a decision that says, look, commission, you need to reverse your decision because it's incorrect that the facts on the record state or indicate that. So then I take it you don't want a remand. You want us to evaluate the record to see if the decision is consonant with the evidence. And if we think it is, we affirm. And if we think it isn't, then we reverse and you win. You're satisfied with that? Well, I mean, you've got to tell us what you want. I would prefer that whether you all address the issue or whether the commission addresses the issue, I think the fact that critical evidence was overlooked needs to be addressed. I mean, critical evidence on the effect of the emergence of China as a net exporter, the effect of mass trade. Well, this is now repetition. This is the third time we've heard all that. So let's hear from the government and we'll give you back some rebuttal time. Thank you, Your Honor. Mr. Bernstein, good morning to you. Welcome. Good morning. Please proceed. May it please the court, the sole issue raised in this appeal is whether substantial evidence supports the commission's negative determinations, particularly with respect to its findings that a significant volume of septic imports was not allotted. That doesn't seem to be what Mr. Shane is arguing that the principal issue is. So when you say the sole issue is something else, we're not joining here to get some kind of resolution. What's your response to what he said? Well, I mean, there are two. That question is well put. There are two propositions here I think the court needs to keep in mind. First of all, with respect to the substantial evidence fact, because I believe one of Mr. Shane's closing comments in response to one of the court's questions is that he would prefer that the court simply find that there was no basis for the commission's decision, that the commission's decision was wrong. Well, here what the court's precedent indicates the standard is, as far as the substantial evidence standard review, is that there be a black and white answer to disputed issue. And we subscribe that as an answer. I don't think we need a lecture on what the legal standard is. I think it would be helpful to us if you would respond to the specific arguments that Mr. Shane just voiced with you sitting here. Okay, let me go to this Chinese displacement issue. Let us review what the commission's findings were because the appellant did not completely describe the commission's findings. With respect to Japan, there was one very important finding the commission made, which isn't mentioned in, Mr. Shane didn't mention it in his argument and it wasn't mentioned in any of their briefs. This was that the Japanese producers were not export-oriented. They were very heavily focused. Well, we have the decision. We've read it. We can refer back to it. You don't need to try to summarize it all for us. His point seems to be that despite all the things they did say, several things that they didn't say were so important that the mere fact that they weren't addressed makes the decision vacatable at the least. I think that the controlling legal standard here is not the one set forth by Mr. Shane, several of which go to decisions of the Court of International Trade, but the statement made by this court in the Timken Corporation case, which is whether the commission's decision addressed aspects of important problems sufficient for the court to engage in judicial review. Again, the standard isn't the dispute. The dispute is whether on this record that sort of standard is met or not. And I don't hear you saying why it was met. It was met for two reasons. First of all, I think, as the Court's questions indicate, that the commission opinion examined why there was... examined the evidence conferred on displacement. And what it found was that on... with respect to Japan, first of all, again, there was not export orientation. Second of all, the significant declines began well before China was a net exporter. Here in the commission, again, certainly, the tables it cited in the report indicated that it had considered all the information. While it may be true the commission did not comment on every specific number on the record, as I believe Judge Michel indicated in one of his comments, that is not a legal requirement that the commission cite every possible date of permutation for every possible year. But Judge Bryson is surely correct that the commission can't go to the extent of refusing to address what was termed the elephant in the room. So we're left to try to figure out whether the omissions that Mr. Shane cites were elephants in the room or not. And you're not helping us with that. It was not an elephant in the room because the commission considered the important aspect of the problem, which is that the commission... You're just saying all the things they did discuss were the important things and all the things they didn't discuss were the unimportant things. But that doesn't tell us why the things Shane cited have to be viewed by us as unimportant. Well, first of all, we believe they're unimportant because we believe that it's the commission's prerogative to decide which evidence is most probative on this issue of why Japanese exports were declining. It was acknowledged that Japanese exports were declining and the commission's function is to evaluate the evidence. The commission's examination was obviously the argument was made, the argument was acknowledged. What's your response to the price differential problem? The response to the price differential problem is, first of all, the commission looked at a great deal of historic data in the record. The historic data indicated, first of all, Mr. Shane's assertion that significant gaps existed only during the last three months of 2005 is factually wrong. There were significant price gaps in 2001 and 2002. There were significant gaps between the US and China, the largest Asian market for beams, all throughout 2005. In none of these periods did exports from any source, whether or not subject to order, increase. Did the evidence show that those earlier price disparities were as great as the price disparities in the late period that Mr. Shane was referring to? They were certainly on a comparable level. Empirically, the ones in the latest period were the highest, but I think we have a degree of measure. The other thing that I think should be mentioned is that there's some degree of volatility here. I think it is reasonable for the commission to look at the entire corpus of data collected over the entire period of review rather than focusing on this three-year period, particularly when there was evidence on the record that prices were volatile, and the commission made a finding in its pricing section that was not uncontested that scrap prices, if scrap is the principal raw material for structural steel beams, were likely to go down. So this phenomenon in the last three months... You're referring to US scrap prices? Yes, US scrap prices, which would indicate that this trend only exhibited during the last three months when US prices were going up was not necessarily a trend you could extrapolate. So I think because the commission in these is doing projections, certainly the commission was acting reasonably, not doing projections based solely on this three-month period, particularly given other evidence in the record indicating that this three-month period was not necessarily representative of what was likely to happen in the future. Perhaps we should give Mr. Cameron a chance to address these issues. Thank you. With all due respect, I'm also accompanied by co-counsel Julian Mendoza. Let's just start off with one thing. There is not one issue that has been raised by counsel that was not addressed by the commission in detail. If you want to start out with the issue on China, let's put it into some perspective. The issue on China was analyzed in the context of the issue that had been raised by petition, which was the change in the balance of supply and demand in Asia, partly due to China, going to force a change in the supply. Well, the ITC looked at this from two standpoints. First of all, it was an important question. Why? Because, as the commission points out at the beginning of its opinion, it was the supply imbalance in Asia in 1998 that created the problem in the first place. So it's an important question. Secondly, they not only addressed specifically the issue of supply and demand in the specific markets in Korea and Japan, contrary to the assertion of counsel, and that's on pages 15, footnote 1, that is JA 2.1, and page 16 of the opinion. So they did specifically address it. But more importantly, they put the issue of the Japanese and Korean markets into the context of Asia. Why? Because there's a certain amount of tension here between counsel's assertion that China, you have to look specifically at China, is pushing Korea and Japan out of the Asian market, and then in their argument with respect to Asia, supply and demand, which the ITC found to be in balance, for them to say, oh, but they didn't look specifically at Korea and Japan. And the fact of the matter is, the ITC looked at both because there is tension there. They recognize that Korea and Japan are part of the greater Asia. That's where their markets are. And that was what they analyzed. They specifically analyzed with respect to Japan, and they said, well, yes. And this gets to your point, your honor's point, about the issue of the timing of 2004. So why is 2004 wrong? And it gets to your honor's question about forecasting ahead. Yes, the ITC said, well, with respect to Japan, it's clear that their withdrawal was significant, and it occurred long before this transition that you're speaking of. Let me ask you a question. What happened after that transition? And the answer was pretty clear. Nothing. What had happened is the Japanese had basically, yes, withdrawn, they had reduced their Asian exports, but they increased exports to anywhere else. It's clear from the record in the chart that's referred to that the answer is no, they didn't do anything. There was no change. In the case of Korea, Korean exports had been peaking in the Asian markets. And if you look at the raw data that is part of the ITC's record, the ITC said, yeah, well, yeah, Korea was significant to Asia. And you know what? After the transition in 2004, not much changed. When you refer to their exports to Asia, again, we would suggest that you look at the specific numbers that are in the record. I think it's JA605. Oh, I'm sorry, your honor, my mistake. The numbers in the record are on page JA593, which is the markets that they are selling to. And you'll see that the raw numbers don't change that much. And that's what the ITC said. They said, well, okay, I see there's a transition, but you know what? There isn't a significant change. So number one, the ITC did not ignore one argument, not one, these arguments, every one of the arguments that has been presented here, not only did the ITC address them, but the evidence is on the record, it was analyzed by the ITC, and they put China into the context of Asia, and they analyzed it on both fronts. Secondly, with respect to price disparities, there's a couple of things that have to be put into context here. Number one, they are wrong. The ITC looked at it in two ways. First of all, you talk about the end of the period, which is really their focal point. They haven't talked to you about the fact that there are other things going on, i.e., the non-price factors. The ITC recognized ocean freight, which has to be added to that chart on pricing on page 605, page 605. The number is in the record. That's about $60. Pardon me? That's $60, right? It is, but that's a confidential number. I'm sorry. That's okay. It's like... Yeah, correct. Now, number two. Number two, they also recognize... It's navigating a minefield to try to work through these confidential cases without spilling the beans. I'm just happy that it's you and not me. You're out of here. The second thing they did is they have not taken into account the price premium testified to by who? By us? By respondents? No, by their witnesses. And that number, which is a public number, is $20 to $40. Now, I would suggest that if you want to add those numbers to this chart, you'll see there is no price disparity at any point in time. Any further point? Your time has expired. Yes, Your Honor. Just one more point. What the ITC then did here, and the Council's already addressed draft volatility and imported, but they took then China and they looked at the next page, which was CIS and other Far East countries, and they said, there are large price disparities there. Oh, that's interesting. Let's see what the price disparity there, what effect does that have on imports? And what they found was it had no effect, no imports had increased from anywhere despite the transition of China, despite the price disparities. And they said the industry had achieved 95.4% market share, which is basically their peak. And if you then take that into account and look at what the ITC found was the critical issue, one of the fundamental issues which has never been mentioned by petitioner, which is the critical factor of the importance of short supply in determining whether there's going to be an increase in imports. And that was what they focused on. And they said, you know, when we analyze this, there is no correlation between price disparities, the correlation is between short supply. Thank you. I sincerely appreciate your patience, Your Honor. Thank you. Mr. Shane, three minutes. Thank you, Your Honor. With respect to the price gap issue, again, we are not contesting that there was no other price gap throughout the relevant period of review. What our contention is is that that price gap grew substantially and was much greater than any price gap that preceded it, including that which was found to be so fundamental in the original investigation. And that price gap was significant to overcome things such as freight costs, for example, that Your Honor referred to. And that's the critical issue because prior price gaps were not sufficient to overcome those sort of hindrances to export. And so for the commission to rely on the fact that, yes, there were some more modest price gaps earlier, and the commission said, look, that did not result in any non-subjecting beams coming into the U.S., therefore price gaps don't matter, which is what they concluded, doesn't bear on the question of what happened at the end of the review period when those price gaps became substantial, which was never addressed by the commission. With regard to the issue of China and China's emergence as a net exporter, the commission did not address the fact that Japanese and Korean exports to China fell off dramatically from the 2004 to 2005 period. And that's the critical period that needs to be looked at because the question is, what effect is that emergence, China's emergence, going to have on these subject producers? The fact that a number of years earlier exports may have tapered off somewhat doesn't address that question. In addition, on the Korean side, and I believe the Koreans have admitted this in their brief, that as China pushed out the Koreans in Asian markets, they had to look elsewhere. The commission saw that and said, okay, that establishes that there is no effect with respect to China's emergence as a net exporter of beams. And I think that's a conclusion that can't be supported by the facts. That ties directly into our argument that the fact that China's out there now competing head-to-head with the Koreans is pushing them out of Asian markets into Europe, for example, and other markets because they've got to find new outlets for this great amount of production that they have. What is the, to avoid confidential information, you might be able to give me this in a kind of rough approximation. What is the difference between the price differential during the period you focused on, the most recent of the period under review, versus the highest price differential earlier than that that the commission was focusing on? That evidence is on the record. It's bracketed, though. Right, I understand. But can you give me an approximation? It's above that freight figure in terms of the differential that happened at the end. And that is not only with respect to what was going on in Asian markets but with respect to other global markets as well. I mean, if you look at the chart that's on the record, Your Honor, you can see, it's very easy to trace the price differentials and see at the end of the period that that differential really spiked. And that really is the critical part of our contention with regard to the price gap. Thank you. Thank you. We thank all three counsel. We'll take the appeal under advisement.